# In the United States Court of Federal Claims

No. 17-1797C
(Filed: December 20, 2018)

|  |  |
|---|---|
| BOAZ HOUSING AUTHORITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | Keywords: Housing Act of 1937; HUD; Breach of Contract; Money Mandating; Holmes v. United States; Presumption of Money Damages. |

*Carl A.S. Coan III*, Coan & Lyons, Washington, DC, for Plaintiffs.

*A. Bondurant Eley*, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Franklin E. White, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

The plaintiffs in this breach-of-contract action include over 500 public housing authorities ("PHAs" or "Plaintiffs"), each of which has entered an annual contributions contract ("ACC") with the Department of Housing and Urban Development ("HUD"). They allege that HUD breached the ACCs in 2012, when it did not comply with the regulations that govern the allocation of operating subsidies in circumstances where there are insufficient appropriated funds available to pay them in full. Plaintiffs request an award of damages in the amount of at least $132,507,658, as well as the costs and expenses of bringing this action.

The issues before the Court on the merits of this case are identical to those this Court resolved in Public Housing Authorities Directors Ass'n v. United States, 130 Fed. Cl. 522 (2017) ("Public Housing"). In Public Housing, this Court agreed with the plaintiffs that the government breached its obligations under the ACCs when it applied an operating expense offset in response to the 2012 Appropriations Act, rather than the pro rata reduction rule prescribed by Title 24 of the Code of Federal Regulations ("C.F.R."). Id. at 536. It awarded damages in excess of $130 million to the group of over 300 public housing authorities that were plaintiffs in those consolidated cases. See id. at 525.

Currently before the Court in this case is the government's motion to dismiss Plaintiffs' complaint for lack of subject-matter jurisdiction and/or for failure to state a claim. ECF No. 16.[1] For the reasons set forth below, the government's motion is **DENIED**.

## BACKGROUND

**I.     Statutory and Regulatory Framework**

As noted, the complaint in this case presents the same legal claims as those adjudicated in Public Housing. To briefly recapitulate, the underlying legal authority for the federal government's public housing program is the United States Housing Act of 1937 ("the Housing Act"), codified at 42 U.S.C. §§ 1437 et seq. It "exists 'to assist States and political subdivisions of States to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families' and 'to address the shortage of housing affordable to low-income families.'" Pub. Hous. Auths. Dirs. Ass'n, 130 Fed. Cl. at 525 (quoting 42 U.S.C. § 1437(a)(1)). "The federal government does not own, manage, or maintain public housing"; instead, responsibility for such ownership, management, and maintenance is vested in public housing authorities. Id.[2]

The Housing Act provides that HUD "may make annual contributions to public housing agencies to assist in achieving and maintaining the lower income character of their projects." 42 U.S.C. § 1437c(a)(1). There are two sources of funding for these contributions: (1) the capital fund, which provides funds "to carry out capital and management activities"; and (2) the operating fund, which supplies funding "for the operation and management of public housing." Pub. Hous. Auths. Dirs. Ass'n, 130 Fed. Cl. at 525 (quoting 42 U.S.C. § 1437g(d) & (e)).

This case involves the operating fund. Congress delegated authority to HUD to determine how much assistance it would provide public housing agencies from that fund each fiscal year. Id.; 42 U.S.C. § 1437g(e)(2)(A). HUD exercised its authority by issuing regulations setting forth an operating fund formula. See generally 24 C.F.R. Part 990. The regulations also address how to proceed if Congress fails to appropriate sufficient funds to pay the aggregate formula amount due to all public housing agencies in any particular fiscal year. 24 C.F.R. § 990.210(c). That provision states that "[i]n the event that insufficient funds are available, HUD shall have discretion to revise, on a pro rata basis, the amounts of operating subsidy to be paid to [public housing agencies]." Id.

Under the Housing Act, operating fund subsidies may be used by public housing agencies "for the operation and management of public housing." 42 U.S.C. § 1437g(e)(1). The permissible

---

[1] The operative motion to dismiss is the Corrected Motion to Dismiss filed by the government on May 2, 2018. ECF No. 16.

[2] A public housing agency (or authority) is "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the development or operation of public housing." 42 U.S.C. § 1437a(b)(6)(A).

uses of operating subsidies include expenditures for "procedures and systems to maintain and ensure the efficient management and operation of public housing units"; "activities to ensure a program of routine preventative maintenance"; "anticrime and antidrug activities"; "the costs of insurance"; "the energy costs associated with public housing units"; "the costs of administering a public housing work program"; "the costs of repaying, together with rent contributions, debt incurred to finance the rehabilitation and development of public housing units"; "the costs associated with the operation and management of mixed finance projects"; and "the costs of operating computer centers in public housing." Id. The statute also contains some restrictions on the uses to which the operating subsidies may be put, see, e.g., 42 U.S.C. § 1437g(g) (entitled "Limitations on use of funds"), and it specifies sanctions for improper use, including—among other things—the termination or reduction of payments otherwise due under 42 U.S.C. § 1437g, see 42 U.S.C. § 1437d(j)(4).

## II.    The Annual Contribution Contracts

The Housing Act provides that the Secretary "shall embody the provisions for . . . annual contributions in a contract guaranteeing their payment." 42 U.S.C. § 1437c(a)(1). These ACCs are "contract[s] prescribed by HUD for loans and contributions, which may be in the form of operating subsidy, whereby HUD agrees to provide financial assistance and the PHA agrees to comply with HUD requirements for the development and operation of its public housing projects." 24 C.F.R. § 990.115.

The ACCs incorporate by reference Title 24 of the C.F.R., i.e., HUD's regulations regarding, among other things, the operating fund subsidy. Compl. Ex. 1, at 3, ECF No. 1-1 ("[T]hose regulations promulgated by HUD at Title 24 of the Code of Federal Regulations . . . are hereby incorporated into this ACC by reference as if fully set forth herein."). The ACCs also require that "HUD shall provide annual contributions to the HA in accordance with all applicable statutes, executive orders, regulations, and this ACC." Id. at 2.

## III.   FY2012 Appropriations

Plaintiffs' claims in this case, like those of the plaintiffs in Public Housing, arise out of Congress's failure to provide sufficient funding for the operating fund formula in 2012 and HUD's corresponding distribution of that insufficient amount. Compl. ¶¶ 66–71. For FY2012, President Obama sought $3,961,850,000 for operating fund subsidies, but included in his budget request "a proviso stating that in determining [PHAs'] . . . calendar year 2012 funding allocations . . . the Secretary shall take into account PHAs' excess operating reserves." Pub. Hous. Auths. Dirs. Ass'n, 130 Fed. Cl. at 527 (quotation omitted) (alteration and omissions in original). As a result, HUD announced that it would adjust the 2012 operating fund subsidies based on each public housing authority's excess operating reserves. Id. Shortly afterwards, Congress enacted an appropriation law adopting the president's proposal. It appropriated $3,961,850,000, "[p]rovided, [t]hat in determining public housing agencies' . . . calendar year 2012 funding allocations . . . the Secretary shall take into account public housing agencies' excess operating fund reserves." Id. at 528 (quoting Pub. L. No. 112-55, 125 Stat. 552, 680 (2011)) (alterations and first omission in original) (emphasis omitted).

HUD then calculated the operating subsidies for 2012. Based on the formula, the aggregate amount due all public housing authorities was $4,888,046,046. Compl. ¶ 69.[3] Congress, therefore, had only made available for distribution to the public housing authorities approximately 80.63% of the full funding amount. Id.[4] Rather than using this percentage to prorate each PHA's formula amount, HUD, in accordance with Congress's appropriation, first adjusted its calculations based upon excess operating reserves. Thus, for those public housing authorities with excess operating reserves, HUD "subtracted a portion" of their excess operating reserves from their formula amounts. Id. ¶ 70. As a result, each authority received a varying percentage of its full formula amount depending upon whether it had a certain amount of excess operating reserves. Id. ¶¶ 70, 81–82; see also Pub. Hous. Auths. Dirs. Ass'n, 130 Fed. Cl. at 528 (stating that in 2012 "the reduction of the PHAs' payments to account for the budget shortfall were not made on a pro rata basis" and describing the procedure in detail).

### IV. The Public Housing Decision

As stated above, the issues on the merits in the present dispute are nearly identical to those present in Public Housing. In that case, over 300 PHAs and two public housing trade associations alleged that HUD breached the ACCs it entered with the PHAs in 2012 when it "reduced their operating subsidy payments on a non-pro rata basis, in conflict with the Title 24 regulations incorporated in the ACCs." Pub. Hous. Auths. Dirs. Ass'n, 130 Fed. Cl. at 529.

Although it challenged the standing of a small number of the plaintiffs in Public Housing, the government did not dispute this Court's subject-matter jurisdiction over the case as a whole.[5] The case proceeded on cross-motions for summary judgment, with the government arguing that HUD's methodology for dispensing subsidies in 2012 "was compelled by the requirements of the 2012 Appropriations Act, and that compliance with that Act was required by the ACCs themselves." Id. at 532. The government also argued that the plaintiffs were not entitled to summary judgment because "provisions in the ACCs and HUD's regulations [] state that operating subsidy payments are subject to or limited by the availability of funds." Id.

The Court agreed with the housing authorities and granted summary judgment in their favor. First, it found that "the parties undertook a contractual obligation to comply with the terms of [HUD's Title 24 regulations]." Id. Next, the Court determined that those regulations expressly

---

[3] For purposes of deciding the government's motion to dismiss, the Court assumes the facts alleged in the complaint to be true.

[4] Of the $3,961,850,000 Congress appropriated, only $3,941,171,376 was available for distribution to the public housing authorities. Compl. ¶ 69.

[5] Specifically, the government argued that sixteen of the housing authorities "did not suffer any injury-in-fact because they did not have excess operating reserves and therefore were not subject to the offset about which they complain." Id. at 529. The government also sought dismissal of claims brought by the two public housing authority trade associations "because the two association plaintiffs were not parties to any contract with HUD." Id. The Court agreed that these plaintiffs lacked standing and dismissed accordingly. Id. at 530–31.

4

established that the subsidy payments would be distributed "on a pro rata basis." Id. at 533 (citing 24 C.F.R. § 990.210(c)). By contrast, the 2012 Appropriations Act was not incorporated into the agreement. Id. at 535. The Court also determined that "the language in the regulations (and in the ACCs) that makes the government's obligation to pay operating subsidies 'subject to the availability of funds' does not excuse HUD's failure to apply the methodology set forth in the regulations for determining the amount of the operating subsidy payments." Id. at 536. Accordingly, the Court determined that HUD had breached the ACCs in 2012 when it failed to distribute available funds on a pro rata basis as prescribed in Title 24. Id.

## V.       This Action

On November 15, 2017, Plaintiffs filed their complaint in this case. ECF No. 1. They assert a single cause of action: breach of contract based on HUD's "reduction of operating subsidies on a non-pro rata basis." Compl. at 72 (capitalization altered). Plaintiffs allege that the ACCs incorporated Title 24 into the contracts and that, as a result, the ACCs required HUD to reduce the operating subsidies on a pro rata basis when Congress failed to appropriate a sufficient amount to fully fund the operating fund formula in 2012. Id. ¶¶ 78–80. They further allege that because HUD reduced Plaintiffs' subsidies to a greater extent than those PHAs that did not have excess reserves, HUD reduced Plaintiffs' operating subsidies on other than a pro rata basis, in breach of the ACCs. Id. ¶¶ 81–83. Plaintiffs thus seek, among other things, "compensatory damages in the aggregate amount of at least $132,507,658." Id. at 73.

On April 18, 2018, Plaintiffs filed a motion for summary judgment. ECF No. 9. That same day, the government filed a motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). ECF No. 10.[6] The government then filed an unopposed motion to stay briefing on Plaintiffs' summary judgment motion until after resolution of its motion to dismiss (ECF No. 11), which the Court granted (ECF No. 12).

In its motion to dismiss under RCFC 12(b)(1), the government argues that the Court lacks subject-matter jurisdiction over Plaintiffs' complaint because the ACCs "cannot be fairly interpreted to mandate an award of money damages for breach." Def.'s Corrected Mot. to Dismiss ("Def.'s Mot.") at 9. It contends for essentially the same reason that Plaintiffs' complaint fails to state a claim upon which relief can be granted under RCFC 12(b)(6). Id. at 10, 19.

The Court held oral argument on the government's motion on December 13, 2018.

## DISCUSSION

### I.      Standards for Adjudicating a Motion to Dismiss Under RCFC 12(b)(1)

In ruling on a motion to dismiss for lack of subject-matter jurisdiction under RCFC 12(b)(1), courts "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). The plaintiff bears the burden of proving, by a

---

[6] The government filed a corrected motion to dismiss on May 2, 2018. ECF No. 16.

preponderance of evidence, that the court possesses subject-matter jurisdiction. Id. If jurisdictional facts are challenged, the court is not limited to the pleadings in determining whether it possesses subject-matter jurisdiction to entertain a plaintiff's claims. Banks v. United States, 741 F.3d 1268, 1277 (Fed. Cir. 2014).

## II.     Tucker Act Jurisdiction in Breach-of-Contract Cases

The Tucker Act provides that the Court of Federal Claims "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). It is well established that the Tucker Act—a jurisdictional statute—"does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 398 (1976). Generally, therefore, a plaintiff must identify a separate money-mandating source of substantive rights to establish the court's jurisdiction. See Fisher v. United States, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part).

In breach-of-contract cases, a plaintiff's burden of establishing a basis for Tucker Act jurisdiction is generally easy to satisfy. Because "damages are always the default remedy for breach of contract," United States v. Winstar Corp., 518 U.S. 839, 885 (1996), a plaintiff in a breach-of-contract case "comes armed with the presumption that money damages are available, so that normally no further inquiry is required," Holmes v. United States, 657 F.3d 1303, 1314 (Fed. Cir. 2011). See also Higbie v. United States, 778 F.3d 990, 993 (Fed. Cir. 2015) (observing that "[c]ontract law is a separate source of law compensable under the Tucker Act" and that typically in a contract case, "the presumption that money damages are available satisfies the Tucker Act's money-mandating requirement"); Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007, 1008 n.7 (Ct. Cl. 1967) (distinguishing between contract claims and those based on a statute, regulation, or provision of the Constitution; noting that only the latter require a money-mandating inquiry for Tucker Act purposes).

Of course, the United States "has not consented to suit under the Tucker Act for every contract." Higbie, 778 F.3d at 993. For example, "contracts that are entirely concerned with the conduct of parties in a criminal case, without a clear, unmistakable statement triggering monetary liability, do not invoke Tucker Act jurisdiction." Id. "Express disavowals of money damages within a contract's terms likewise defeat jurisdiction." Id. (quoting Holmes, 657 F.3d at 1314). And "Tucker Act jurisdiction may also be lacking if relief for breach of contract could be entirely non-monetary." Id. "In such a case, it is 'proper for the court to require a demonstration that the agreements could fairly be interpreted as contemplating monetary damages in the event of breach.'" Id. (quoting Holmes, 657 F.3d at 1315).

## III.    The Government's Motion to Dismiss Lacks Merit

In its motion to dismiss, the government contends that Plaintiffs do not enjoy the benefit of the presumption of Tucker Act jurisdiction that comes with a breach-of-contract claim. They contend that "the duty that plaintiffs[] allege HUD violated (to reduce allocations from the Operating Fund in 2012 'pro rata') is established by Federal regulation (24 C.F.R. § 990.210(c)),

6

and merely incorporated by reference" into the contract. Def.'s Mot. at 12. In any event—according to the government—even if the presumption is applicable, it has been rebutted. See id. at 13–14. Specifically, the government argues that the ACCs cannot fairly be interpreted to contemplate an award of money damages for breach because under the statutes and regulations incorporated into the contract, the operating subsidy moneys that Plaintiffs receive may only be used for specified purposes. Id. at 12.

For the reasons set forth below, the government's contentions lack merit.

### A. **Plaintiffs' Claims Are Contract-Based**

The government's first argument—that Plaintiffs' claims are not essentially contractual in nature—is inconsistent with controlling law. The court of appeals has squarely held that the fact that contractual provisions "were required by and incorporated the governing regulations . . . does not make them any less contractual obligations or provisions, or constitute a valid reason for not treating them as such." San Juan City Coll. v. United States, 391 F.3d 1357, 1360 (Fed. Cir. 2004); see also Brighton Vill. Assocs. v. United States, 52 F.3d 1056, 1058–59 (Fed. Cir. 1995) (affirming the Court of Federal Claims's exercise of Tucker Act jurisdiction over breach-of-contract claim seeking money damages based on violations of HUD regulations that were incorporated by reference into contracts).

Brighton Village is particularly instructive. The plaintiff therein was a participant in HUD's Section 8 housing program. Brighton Vill., 52 F.3d at 1057. It sued the United States for breach of contract after HUD failed to make annual rent adjustments for its subsidized housing project, as allegedly required by HUD regulations that were incorporated by reference into the contract. Id. at 1057–58. The court of appeals held that the Court of Federal Claims had jurisdiction over the case under the Tucker Act. Id. at 1059. It reasoned that "title 28 assigns most Government contract cases to the Court of Federal Claims" in order to "ensure uniformity in Government contract law," that the plaintiff "[sought] unliquidated damages from HUD for breach of an express contract," and that "[t]herefore, the Court of Federal Claims properly exercised jurisdiction over this case." Id. at 1059.

The government's counterargument is that Plaintiffs' claims in this case are not, by their "true nature," contract claims under the reasoning of Katz v. Cisneros, 16 F.3d 1204 (Fed. Cir. 1994). See Def.'s Mot. at 14. Katz, however, is inapposite.

The plaintiff in Katz was a developer that had entered a housing assistance payment ("HAP") contract with a public housing authority that administered the Section 8 program. 16 F.3d at 1206. The contract incorporated by reference HUD regulations that governed the amount of rent that could be paid by the public housing authority to the developer. Id. at 1205–06. HUD conducted an audit which found that—based on its regulations—the contract rents being paid to the plaintiff were too high. Id. at 1206. The plaintiff then filed suit in district court to challenge HUD's interpretation of its regulations. Id. at 1206. The court of appeals reversed the district court's decision, in which it had transferred the action to the Court of Federal Claims, holding—contrary to the district court's conclusion—that the plaintiff's claim was not one for breach of contract. Id. at 1210. The claim's true nature, the court of appeals held, was a challenge to HUD's interpretation of a regulation under the Administrative Procedure Act ("APA"), 5 U.S.C.

7

§ 702 (1988). Id. at 1209–10. As such, the district court should have exercised jurisdiction over the suit. Id.

The claims in this case are distinguishable from those pressed in Katz. First, as the court of appeals observed in Brighton Village, the plaintiff in Katz was not in privity with the government and thus could not pursue a claim for breach of contract—which would fall within this court's Tucker Act jurisdiction. 52 F.3d at 1059–60. Second, "Katz involved an award of prospective relief, namely, the builder's attempt to require HUD to calculate future contract rents in conformity with the statute." Id. at 1060. Here, however—as in Brighton Village—Plaintiffs are seeking "retroactive monetary relief" based on HUD's failure to make past-due subsidy payments. Id. The court of appeals concluded that "this distinction . . . more clearly denotes a contract damages action in Brighton's claims" and that "[t]he Court of Federal Claims has the power to award money damages on contract claims under the Tucker Act." Id. Accordingly, the court of appeals's decision in Katz does not support the government's argument that Plaintiffs' claims are not by their true nature contract claims.

**B.    The Presumption That Money Damages Are Available for Breach of the ACCs Has Not Been Rebutted**

**1.    The Fact That the ACCs Concern the Administration of a Public Benefit Program Is Not a Basis for Finding Money Damages Unavailable**

As described above, there is a presumption that money damages are available for a breach of a government contract. See Holmes, 657 F.3d at 1314. Indeed, damages are unavailable for breach of contract "only in a limited number of situations." See Rocky Mountain Helium, LLC v. United States, 841 F.3d 1320, 1327 (Fed. Cir. 2016). The contract in this case does not fall into any of the "limited situations" in which money damages have been held unavailable notwithstanding the presumption. The ACCs do not expressly disavow an award of such damages. See id. They do not arise in the context of criminal law. See id. And, they are akin neither to "cooperative" nor to "cost-sharing" agreements which have been held not to fairly contemplate an award of damages for their breach. See, e.g., Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1344 (Fed. Cir. 2008); St. Bernard Par. Gov't v. United States, 134 Fed. Cl. 730, 734–35 (2017).

The government contends nonetheless that money damages are not presumptively available for contracts which, like the ACCs, involve the administration of public benefit programs. Damages are unavailable, the government says, because an ACC "cannot fairly be characterized as 'a commercial contract' that concerns a 'commercial arrangement.'" See Def.'s Reply to Pl.'s Resp. to Its Mot. to Dismiss ("Def.'s Reply") at 3, ECF No. 19 (quoting Rocky Mountain Helium, 841 F.3d at 1327). But neither the Court of Federal Claims nor the Federal Circuit has ever held that only the breaches of contracts that involve commercial subjects are within this court's Tucker Act jurisdiction. In fact, there are a number of cases concerning contracts that involved the administration of public benefits where Tucker Act jurisdiction has been affirmed. See, e.g., Haddon Hous. Assocs., Ltd. P'ship v. United States, 711 F.3d 1330, 1336 (Fed. Cir. 2013); San Juan City Coll., 391 F.3d at 1357–58; Brighton Village, 52 F.3d at 1060.

8

In this case, the essential purpose of the ACCs is to contractually obligate HUD to pay monetary subsidies to Plaintiffs in exchange for their operation of public housing projects in accordance with regulatory and statutory requirements. Indeed, HUD is required to embody the provisions for annual contributions in ACCs for the explicit purpose of "guaranteeing their payment." 42 U.S.C. § 1437c(a)(1). The government's argument—that the provisions of the contract cannot "fairly be interpreted as contemplating money damages in the event of breach"—is therefore unpersuasive. Def.'s Mot. at 19 (citing Holmes, 657 F.3d at 1315).

### 2. The Fact That There Are "Strings Attached" to the Operating Subsidies Does Not Provide a Basis for Finding Money Damages Unavailable

Finally, the Court also finds unpersuasive the government's contention that the "strings attached" nature of the operating subsidies precludes this Court from exercising Tucker Act jurisdiction over Plaintiffs' claims. See Def.'s Reply at 4. The contention lacks merit because the cases on which the government relies to support it—National Center for Manufacturing Services v. United States, 114 F.3d 196 (Fed. Cir. 1997) ("NCMS") and Lummi Tribe of the Lummi Reservation, Washington v. United States, 870 F.3d 1313 (Fed. Cir. 2017) ("Lummi")—are inapposite.

The plaintiff in NCMS was a not-for-profit research and development consortium. 114 F.3d at 197. Congress passed the Appropriations Act for Fiscal Year 1994, which gave the Air Force in excess of $12 billion in funds for certain research and development, and which specified that not less than $40 million of those funds were to be made available only to NCMS. Id. at 197–98. Subsequently, the Air Force and NCMS executed a "'Cooperative Agreement,' which laid out the terms under which NCMS was to proceed with respect to the appropriated funds." Id. at 198. The Agreement contained a provision stating that "the government's 'share for full performance' of the award was estimated at a maximum of $40,000,000, but that only $24,125,000 was 'currently available and allotted at the time of the award.'" Id.

NCMS filed suit in the United States District Court for the District of Columbia "seeking an order directing the Air Force to release the [$15,875,000 in] remaining funds appropriated for fiscal year 1994." Id. The district court granted the government's motion to transfer the case to the Court of Federal Claims pursuant to 28 U.S.C. § 1631, finding that NCMS's claim was "a contract claim against the government in excess of $10,000, for which there is no District Court jurisdiction." Id.

The plaintiff appealed the transfer order to the Federal Circuit. Although the government had argued in the district court that NCMS's case was essentially a contract claim, it defended the transfer on a different ground, arguing that the plaintiff was alleging a claim under a money-mandating statute. Id. at 199. To avoid turning the case into "a jurisprudential Flying Dutchman," the court of appeals held, it would examine the "true nature of the action" in order to "determin[e] the existence or not of jurisdiction." Id. at 199 (quoting Katz, 16 F.3d at 1207). Upon such examination, the court determined that the plaintiff's claims for monetary relief were cognizable under the APA, and not the Tucker Act. Id. at 200. Critical to that result was the fact that the plaintiff's claims were based on a statute and that the plaintiff sought equitable relief, not money damages. Id. at 200, 202.

9

Thus, the court of appeals observed that 5 U.S.C. § 702 "waives the sovereign immunity of the United States only for '[a]n action in a court of the United States seeking relief other than money damages.'" Id. at 199. It found that "NCMS's demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for 'money damages'" because NCMS was seeking to enforce a statutory entitlement to the funds; it was not "seeking money in compensation for losses that it has suffered or will suffer as a result of the withholding of those funds." Id. at 200. APA review was also not precluded by 5 U.S.C. § 704, authorizing such review only "if there is no other adequate remedy in a court," because the Court of Federal Claims lacked the jurisdiction to afford the plaintiffs the relief they sought. Id. at 199. Specifically, the complaint in NCMS "ma[de] clear that [it] anticipate[d] the need for injunctive relief, such as an order enjoining the defendants from obligating and disbursing particular funds that should be reserved for NCMS, and '[e]xtending the time of obligation' in the Appropriations Act to preserve the status quo." Id. at 201. In addition, NCMS "would not be entitled to a monetary judgment that would allow it to use the funds appropriated under the Act for any purpose, without restriction," because "[t]he Act . . . contemplates a cooperative, ongoing relationship between NCMS and the Air Force in the allocation and use of the funds." Id.

Here, by contrast, Plaintiffs do not seek prospective relief or the release of funds to which they are entitled under the relevant HUD regulation. Instead, they seek an award of money damages to compensate them for losses they suffered as a result of the withholding of the operating subsidies owed to them for 2012. The purpose of such a monetary award would be to compensate them for the government's failure to meet a past-due obligation, not to enforce the regulatory obligation itself. See Bowen v. Massachusetts, 487 U.S. 879, 895 (1988) (distinguishing between "[d]amages," which "are given to the plaintiff to substitute for a suffered loss," and "specific remedies" which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled") (emphasis omitted); Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev., 480 F.3d 1116, 1123 (Fed. Cir. 2007) (observing that in Bowen, "the Court understood the term 'money damages' to mean 'compensation for the damage sustained by the failure of the Federal Government to pay as mandated'" as contrasted with what the Court characterized as "specific relief" designed "'to enforce the statutory mandate itself, which happens to be one for the payment of money'") (quoting Bowen, 487 U.S. at 893, 900) (emphasis omitted). NCMS therefore does not support the government's jurisdictional arguments in this case.[7]

---

[7] At oral argument, counsel for the government contended that the reasoning of NCMS extends to breach-of-contract cases because there was a cooperative agreement between NCMS and the government that prescribed how NCMS could use appropriated moneys. But, as the court of appeals explained, "only $24,125,000 was allotted to the Cooperative Agreement." NCMS, 114 F.3d at 202. Therefore, "NCMS's claim would require that the remaining $15,875,000 be obligated and made available to NCMS either by supplementation of the Cooperative Agreement or by formation of a new agreement." Id. NCMS was thus seeking the kind of equitable relief the Court of Federal Claims cannot provide, in the form of an order that would require the Air Force "to expand the existing contractual relationship or to create a new one to cover the remaining appropriated but unobligated funds." Id.

The other case on which the government relies, Lummi, is similarly distinguishable. The plaintiffs in Lummi were an Indian tribe and tribal housing entities that were recipients of block grants under the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"). 870 F.3d at 1315. The grants were intended to assist the tribes in providing affordable housing to their members, and the grant amounts were derived from a regulatory formula that considered, among other things, "'[t]he number of low-income housing dwelling units . . . owned or operated' by the tribes on NAHASDA's effective date." Id. (quoting 25 U.S.C. § 4152(b)(1)–(3)) (alteration and omission in original). The grants were subject to statutory limitations which required that they be used "only on statutorily specified activities in accordance with program requirements." Id.

In 2001, HUD's Inspector General issued a report in which he concluded that the regulatory formula that HUD had been using to determine grant amounts had credited the tribes for certain housing units that were not eligible for consideration under the statute. Id. at 1315–16. HUD informed the plaintiffs of the amounts overfunded and ultimately recouped the excess funding by making deductions from subsequent grant allocations. Id. at 1316.

The tribes then brought suit in the Court of Federal Claims under the Tucker Act and the Indian Tucker Act, 28 U.S.C. §§ 1491(a)(1), 1505. Id. The government moved to dismiss, arguing that the court lacked jurisdiction because the statute's block grant provision was not money-mandating. Id. The Court of Federal Claims denied the government's motion, but it ultimately certified the jurisdictional question for interlocutory appeal. Id. at 1317.

On appeal, the Federal Circuit reversed. It held that NAHASDA is not a money-mandating statute because it could not "fairly be interpreted as mandating compensation by the Federal Government for . . . damages sustained," nor did it "grant[] the claimant a right to recover damages either expressly or by implication." Id. at 1317 (internal quotations and citations omitted). Finding NCMS "instructive," the Court held that NAHASDA's failure to meet either criterion is "revealed by the ultimately equitable nature of the Tribe's claims." Id. at 1317.

Thus, the court of appeals noted, the harm alleged by the tribes was that they were "allocated too little in grant funding." Id. at 1318. "[A]t best," the court of appeals reasoned, "the Tribes seek a nominally greater strings-attached disbursement." Id. "But any monies so disbursed could still be later reduced or clawed back" under the statute. Id. (citing 25 U.S.C. § 4161(a)(1)). Further, "any property acquired with said monies would be 'held in trust' by the Tribes, 'as trustee for the beneficiaries' of NAHASDA." Id. (quoting 2 C.F.R. § 200.316 and citing 24 C.F.R. §§ 85.1, 1000.26). "To label the disbursement of funds so thoroughly scrutinized and cabined as a remedy for 'damages,'" the court of appeals held, "would strain the meaning of the term to its breaking point." Id. Instead, "[a]s [NCMS] highlights, that relief is equitable—and thus not within the Claims Court's purview." Id. at 1318–19.

In short, in Lummi, "the underlying claim [was] not for presently due money damages. It [was] for larger strings-attached NAHASDA grants—including subsequent supervision and adjustment—and, hence, for equitable relief." Id. at 1319. Accordingly, the court ruled, NAHASDA is not a money-mandating statute. Id.

11

As with NCMS, Lummi is distinguishable from the present case because it did not involve a contract claim, and the question before the court of appeals was whether the statute at issue was a "money-mandating" one for purposes of establishing this court's jurisdiction under the Tucker Act. The critical basis for the court of appeals's determination that the statute was not money-mandating was the equitable nature of the remedy that the plaintiffs sought—i.e., an order directing HUD to release certain grant money, which would necessarily come with "strings attached."

As discussed above, Plaintiffs here do not seek prospective or other equitable relief; they seek an award of compensatory damages based on a breach of contract. They do not seek the release of funds appropriated to pay operating subsidies going forward; on the contrary, they seek damages to compensate for the government's past failure to pay the subsidies in 2012. Lummi, accordingly, does not have any bearing on whether this Court may exercise jurisdiction over Plaintiffs' contract claims under the Tucker Act.

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss is **DENIED**. The stay of briefing on Plaintiffs' motion for summary judgment (ECF No. 12) is **LIFTED** and the government shall file its response **on or before January 17, 2019**. Any reply by Plaintiffs shall be due in accordance with the RCFC.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge